Argued December 13, 1949; modified March 28, 1950

# DUNCAN *v.* BARTLE, ADM'X. ET AL.

216 P. (2d) 1005

452

*Robert G. Davis* and *Dudley C. Walton,* both of Roseburg, argued the cause for appellants. With them on the brief was R. L. Whipple, of Roseburg.

*William F. Johnson,* of Grants Pass, argued the cause for respondent. With him on the brief was O. S. Blanchard, of Grants Pass.

Before Lusk, Chief Justice, and Belt, Rossman, Bailey and Brand, Justices.

ROSSMAN, J.

This is an appeal by the two defendants from a decree of the Circuit Court which dissolved a partnership and adjudicated the accounts between the former partners. The plaintiff-respondent was one of the partners. The other two were the defendant-appellant, Juanita Bartle, and James Claxton, now deceased, of

whose estate the defendant-appellant, Juanita Bartle, is administratrix. The estate is one of the two appellants. The challenged decree (1) dissolved the partnership; (2) wound up its affairs; (3) held that the respondent is sole owner of the assets of the former partnership; and (4) awarded the respondent judgment against the appellants, severally and jointly, in the sum of $667.68. It is conceded that the partnership out of which this suit arose was formed on or about August 12, 1946, and that its purpose was the purchase and operation of an establishment known as the Laurel Camp Cafe. When the partnership was formed the appellant, Juanita Bartle, was the wife of Claxton. It is also conceded that on or about December 16, 1946, that is, about four months after the partnership was formed, the Claxtons left the place of business and never thereafter returned to take any part in its operation. June 8, 1947, Mr. Claxton died. Sometime between December 16, 1946, and June 8, 1947, the Claxtons were divorced.

The appellants present nine assignments of error.

The first, sixth, seventh, eighth and ninth follow:

1. The Court erred in extending to the respondent, the surviving partner, an extension of sixty days after the disposition of this suit in which to file an inventory of the partnership assets.

6. Error was committed in finding that the respondent "had a right under the Uniform Partnership Act (§ 79-610, O. C. L. A.) to continue the operation of the business as a going concern after the dissolution of the partnership."

7. "The Court erred in finding the value of the partnership property to have been $16,000.00 on December 16, 1946."

8. The Court erred in finding that the respondent was entitled to wages as an expense of the partnership after the dissolution took place.

9. The Court erred in finding that the partnership business was operated at a loss.

The effect of the other assignments of error may be summarized as follows:

■ Was the partnership dissolved December 16, 1946, when the Claxtons left the place of business, or not until June 8, 1947, when Mr. Claxton died?

■ Is it possible to determine from the records which the respondent kept the state of affairs between the partners, or should a receiver be appointed with power to sell the business?

The challenged findings of fact recite:

"On December 16th, 1946, both Mr. and Mrs. Claxton, without giving Mrs. Duncan any notice whatsoever, abandoned the partnership * * *. Since no limitation of time was fixed by the parties for the existence of the partnership, it could have been terminated by the express will of any partner, as provided by sub-section (b), Section 79-603, O. C. L. A. There was no evidence produced at the trial which would tend to indicate that any of the partners attempted under this section to terminate the partnership. Both of the Claxtons left the partnership without any word to Mrs. Duncan, and, in fact, Juanita Claxton left in a surreptitious manner. So the Court cannot do other than find that the partnership was not terminated by express will of any partner. * * * In view of that fact, therefore, the Court is bound to conclude that the partnership was terminated on December 16th, 1948. * * * Since the Court has found that the Claxtons caused the dissolution wrongfully on December 16th, 1946, it, therefore becomes necessary to determine now the interest of each partner in the partnership."

Thus we see that the trial court found that the partnership was terminated December 16, 1946, and that its termination was due to wrongful conduct of the Claxtons. The appellants deny that dissolution took place December 16, 1946. They argue that no dissolution occurred until June 8, 1947, and that it was then effected by the death of Mr. Claxton.

We shall now consider the merits of the contention just mentioned. It will be necessary to mention some of the evidence.

For the sake of convenience we shall speak of James Claxton and of the appellant, Juanita Bartle, his wife when the partnership was formed, as the Claxtons. For the same purpose we shall refer to the appellant, Juanita Bartle, by the name she bore while she was active in the partnership, that is, Mrs. Claxton. On or about August 12, 1946, when the Claxtons and the respondent, Mrs. Edna Duncan, formed the partnership, they purchased a business known as the Laurel Camp Cafe at a price of $16,000. The purchase included land, building and equipment. The cafe is located on the Pacific Highway near Wolf Creek. Of the purchase price only $4,500 was paid at the time of the transaction. Each partner contributed $1,500 of the initial payment. The balance of the consideration was payable in monthly installments of not less than $175.00. According to an admitted averment of the complaint, the "partnership was to last for indefinite period of time" and, therefore, by virtue of § 79-603(1)(b), O. C. L. A., which is § 31(1)(b) of the Uniform Partnership Act, the partnership was terminable "by the express will of any partner." No writing evidences the partnership agreement.

The parties contemplated that Mrs. Duncan should

operate the kitchen, that Mrs. Claxton have charge of the dining room, and that her husband should attend the bar when a beer license was obtained, and, in the meantime, render himself useful in other phases of the business.

No one questions the devotion which Mrs. Duncan bestowed upon the business. She freely conceded the faithfulness to the business of Mrs. Claxton as long as the latter remained with the business. The evidence indicates that Mr. Claxton gave the venture inadequate attention.

The Laurel Camp Cafe served meals and beer. Appurtenances to the place were some bedrooms, one of which was occupied by Mrs. Duncan and another by the Claxtons. At the outset the cafe operated twenty-four hours per day.

The partnership had no bookkeeper until July 30, 1947. The absence of accounting records until August 1, 1947, commanded much attention during the trial. None of the three partners had had training in book-keeping. Mrs. Duncan was the only one of the three who maintained records. The entries which she made and the supporting vouchers are before us. Her entries recorded daily expenditures and cash balances for the period of August 12, 1946, to January 22, 1947. From January 22, 1947, to August 1, 1947, the entries were discontinued, but in that interval receipted bills, cancelled checks and similar memorandums were carefully preserved. From August 1, 1947, we have a complete set of books kept under competent supervision. At the outset the records were kept in an unlocked desk in the dining room. Later, the desk was moved into Mrs. Duncan's bedroom. The room was not locked and the Claxtons entered it at will. Accompanying Mrs.

Duncan's account book were all of the ancillary records which came to her hands, such as receipted bills, pay roll items and bank deposit books. In the unlocked desk where the records reposed, Mrs. Duncan placed the cash which was taken from the till about midnight. Although the appellants devote much space in their brief to criticism of the respondent's bookkeeping, the facts just mentioned show that nothing was concealed from them. They were as free as the respondent to maintain records, but kept none. The respondent repeatedly asked them to help with the bookkeeping. While the appellants, during the trial, were engaged in fault-finding with the records, the trial judge remarked: "Each one of the parties was trying to get the other to keep the records." Mrs. Duncan was more faithful than her partners to the drudgery attendant upon the partnership and was the only one who kept records. Mr. Claxton, near the beginning of the venture, suggested that the bookkeeper for a nearby tavern, the Alpine Lodge Cafe, be hired as bookkeeper. The three partners had worked in that place prior to their purchase of the Laurel Camp Cafe. To Mr. Claxton's suggestion, Mrs. Duncan replied that she did not like his choice. The matter was dropped at that point.

One of the customers of the cafe was a truck driver whom the witnesses termed Dutch Bartle. He and Mrs. Claxton became fond of each other. He is now her husband. December 12, at 8:00 p. m., when Mrs. Duncan returned to the cafe after a short absence, she saw Mrs. Claxton and Mr. Bartle in each other's company. During Mrs. Duncan's absence Mrs. Claxton had hired a new waitress who was then on duty. Mrs. Duncan and Mrs. Claxton had had no quarrels or misunderstandings and their relationship was cordial. Shortly

after Mrs. Duncan entered the cafe, Mrs. Claxton told her that she was not feeling well and that she would like to retire for the night. Then, according to Mrs. Duncan's further uncontradicted testimony, Mrs. Claxton said: "Brownie (Mr. Claxton) wants to sell, but I don't want to, and I think I can raise the money to buy him out if he decides to and we will go on just like we are." At that point, so Mrs. Duncan swore, "she put her arm around me and kissed me on the forehead and said 'good night.' " After that adieu Mrs. Claxton entered her bedroom. A couple of hours later a truck driver asked for her, and still later Mr. Claxton sought her. It then developed that the bedroom door was locked from the inside. Next, the discovery was made that Mrs. Claxton, after locking the door, had departed through a window. Nothing was seen of her for the next five weeks. She then returned in the company of Mr. Bartle for a friendly visit and some refreshments. Occasionally after that visit she came back to the cafe to idle the time away, but she never returned for the purpose of working in the place or of participating in its operation. Upon those visits she made no inquiries or suggestions about the business. However, upon one of her visits she addressed Mrs. Duncan with this remark: "Edna, I know you think I am a heel." Upon leaving Laurel Camp Cafe, Mrs. Claxton procured employment in the Alpine Lodge Cafe. Possibly the following testimony given by her discloses the cause of her lack of interest:

"Q. Why didn't you go back to the business, Mrs. Bartle?

"A. Because of the circumstances around there.

"Q. I can't hear you.

"A. Because of the way things was going around there.

"Q. What do you mean by that?

"A. Well, there wasn't no sense in staying there wasting all the time. We wasn't making any money, we was running the customers all out."

She did not elucidate her expression, "we was running the customers all out." For an additional explanation we have the testimony of one Lois Adair, a witness for the respondent, who testified that in the course of a trip to California which she and Mrs. Claxton made before the latter quit the cafe, Mrs. Claxton told her that she disliked to return. We now quote from her testimony:

"She hated to go back, due to the trouble she was having with her husband, that she felt that being as Edna (Mrs. Duncan) had been ill and had been so good to her that she should go back.

Concerning that conversation, Mrs. Claxton testified:

"Q. Is it a fact that you told her that you hated to go back to the business because you had had trouble with Brownie (Mr. Claxton)?

"A. I did at that time.

"Q. And at that time had Mrs. Duncan in fact been good to you?

"A. She had at that time."

While Mrs. Claxton was describing her strange departure, the trial judge asked her:

"The thing I am interested in, this partnership was indebted $175.00 a month under contract, as I recall it. Did you make any arrangements at all as to how this money was to be paid on the contract?

"A. I didn't."

Two days after Mrs. Claxton's departure Mr. Claxton left, never to return. Upon going he took all of his personal belongings with him. When he left

he was unaware of his wife's whereabouts and spent some of the ensuing days in a vain search for her. In his efforts to find his wife, Mr. Claxton went to Arlington, Washington, where one of his cousins, William Mitchell, lived. After he failed to find his wife in Arlington, he told his cousin, so the latter swore, that he was going to get employment as a fisherman. He then left Arlington, but in a few days returned. He had not secured the employment, but now told Mr. Mitchell that he would soon leave for China. He announced the same intention to his mother, according to her testimony. She sought to dissuade him, and since he did not go to China, her advice evidently prevailed. When Mr. Claxton next saw Mr. Mitchell he told him of his need for money and urged his cousin to offer his (Claxton's) interest in the cafe to Mrs. Claxton for $2,000. The offer was made but was rejected. During these visits Claxton told Mr. Mitchell that he had not treated Mrs. Duncan right and that his departure from the cafe was wrong. Mrs. Claxton concedes the singular departure from the business made by herself and her spouse.

While Mr. Claxton was in Arlington he became ill and died June 8, 1947. About two weeks before his death Mrs. Duncan heard of his illness and visited him. Concerning her visit to Mr. Claxton, she testified:

"I heard he was sick, and I was getting awfully tired and I wanted to try to settle it up."

At the time of the visit Claxton was in a hospital. Mrs. Duncan described in the following testimony what occurred when she entered Claxton's room:

"He was so glad to see me that he could hardly talk at first, he just sat with his arm around me, then he said he was glad to see me, because my

daughter and I was the only ones that had been to see him and she couldn't get in, and I told him I worried about him and I was anxious to get things settled up because I knew he would have lots of bills, and he said 'Edna, I don't have anything to settle up; I left you,' and we sat and we talked about it, and he was more than willing to give me permission to sell, as far as he was concerned, and I told him then that I wanted to see Mickey (Mrs. Claxton) and see if we couldn't come to an agreement, and so he said he would have papers, that they would have papers fixed up to that effect.''

Mrs. Duncan made a second trip to see Mr. Claxton, but his strength had so far ebbed away that a visit with him was impossible. About the time when Mrs. Duncan made the second trip to see Mr. Claxton, she attempted to find Mrs. Claxton for the purpose of seeing ''if we could get together and settle it up without having to take it to court.'' Her efforts to locate Mrs. Claxton were unavailing.

Mrs. Claxton's mother was present upon the visit which the quoted language described. She testified:

''He was awful glad to see her, and he taken her in his arms, and he smiled at first when she come in and then he went to crying.''

Mr. Claxton told Mr. Mitchell, so the latter swore, that

''if he had stayed at Laurel Camp and tended to his business he wouldn't have been in the shape he was in then and making some money * * * He said he didn't treat Edna right about the books, because he said she had to take care of the books and he run off different times and left her with it all and all the rest of the work there, and was out on his own, and he should have been there helping take care of the business and the work, and the books.''

We have now reviewed the evidence which depicts the singular manner in which the Claxtons quit the cafe and the relationship which prevailed between Mrs. Duncan on the one hand and the Claxtons on the other. The appellants' brief says: "There was no open rupture between the parties." We fail to find in the record any mention of an unpleasant word which ever passed between them. Mrs. Claxton testified that Mrs. Duncan at times suspected that Mr. Claxton helped himself out of the till, and he disliked the surveillance which Mrs. Duncan gave to the place. The record indicates that Mr. Claxton occasionally took money out of the till for his personal needs, notwithstanding his agreement to the contrary. Apparently he was unfamiliar with business methods and issued several checks which were returned dishonored by the bank upon which they were drawn. Mrs. Duncan redeemed the dishonored checks with her personal funds. If she engaged in the remarks attributed to her by Mrs. Claxton and kept her eye upon her errant partner, she had a basis for what she was doing. Despite the above, a cordial, amicable relationship constantly prevailed between Mrs. Duncan on the one hand and the two Claxtons on the other. They engaged in no bickerings and never addressed unkind words to one another. Mrs. Duncan observed the limitations of Mr. Claxton without giving herself over to rancor.

After the Claxtons left the cafe neither of them offered to return for the purpose of participating in its operation; in fact, Mr. Claxton never returned for any purpose. After they had left, no inquiry came from them about the condition of the cafe's finances, its patronage or other phases of its operation. Neither of them asked whether or not the respondent was.

maintaining the monthly installment of $175 due upon the purchase price.

After the departure of the Claxtons, Mrs. Duncan operated the Laurel Camp Cafe in the same way as when they were there. Her purpose was, so she swore, to keep the business going "until we could get together." When the Claxtons departed she was compelled to hire a man and a woman to perform the work which they had done. She maintained the monthly payment of $175 upon the purchase price of the property and made some betterments to the property. She added materially to the original capital investment.

The conclusion is inescapable that the respondent believed that the Claxtons, or at least one of them, would return to the cafe and resume participation in its operation. Until July 4, 1947, the cafe was kept open twenty-four hours per day, but beginning on that day, Mrs. Duncan, due to the limitations of her strength, found it impossible to maintain the twenty-four hour schedule and closed the cafe from midnight to six in the morning.

In the operation of the business, Mrs. Duncan was assisted, in part, by her daughter, Mrs. Evelyn Hartley, who worked ten hours per day, with the exception of a six-weeks period. She has been paid no more than $400 since the Claxtons left. Mrs. Duncan's testimony indicates that she has taken from the cafe's receipts less than $25 in the form of profit or wages. She has, however, had her meals and has occupied the bedroom which we have mentioned.

Although the foregoing evidence indicates that something resembling an elopement occurred in the stillness of the night of December 12, 1946, in which the participants were Mrs. Claxton and a newly-won

lover, the appellants' brief finds in the circumstance a completely different version. It argues that Mrs. Duncan, for the selfish purpose of gaining the cafe for herself, effected a constructive expulsion of her two partners. It claims that she, and not the Claxtons, was in the wrong. Mrs. Claxton gave testimony which constitutes the springboard, although a weak one, for this contention. She intimated that Mrs. Duncan took advantage of discord which existed between the Claxtons and, through false innuendoes, caused the breach to widen. She indicated that Mrs. Duncan adopted a domineering attitude toward her two partners and usurped the functions of bookkeeping, purchase of supplies, general supervision and the handling of money. The evidence that Mrs. Duncan exploited the marital troubles of the Claxtons may have added a soupcon of spice to an otherwise dull trial, but it leaves us wholly unconvinced. We dismiss those aspersions upon Mrs. Duncan, who appears to be a faithful woman, as groundless.

Section 79-401, subd. (5), O. C. L. A., (§ 18, subd. (e), Uniform Partnership Act), says:

"The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules * * * :

(5) All partners have equal rights in the management and conduct of the partnership business * * * ."

Section 79-402, O. C. L. A., (§ 19, Uniform Partnership Act), reads as follows:

"The partnership books shall be kept, subject to any agreement between the partners, at the principal place of business of the partnership, and every

partner shall at all times have access to and may inspect and copy any of them."

Section 79-403, O. C. L. A., (§ 20, Uniform Partnership Act), provides:

"Partners shall render on demand true and full information of all things affecting the partnership to any partner * * *."

In all likelihood, the Claxtons were unaware of the statutory provisions just mentioned, but the record shows that they knew they were entitled to share in the management of the business and in the maintenance of the records. We are satisfied that their failure to participate more fully in those phases of the business was not due to anything wrongful which Mrs. Duncan did, but to their own lack of interest. They, no doubt, were glad to have their industrious, faithful partner perform those duties. Mrs. Duncan was older than her partners and possessed a greater sense of responsibility. Insurance money received by her following her husband's death and some of the proceeds from the sale of the family home were invested in this little cafe. The latter meant much to her. Mrs. Duncan, therefore, had good reason to give the business close attention and to take upon herself the onerous duties which her partners spurned as drudgery. It will be recalled that when the three were active in the business no unpleasantries occurred between Mrs. Duncan and her two partners; in fact, the incidents which we have reviewed show that the Claxtons manifested affection for Mrs. Duncan. We are satisfied that the claims of a constructive expulsion are wholly unfounded. It was fortunate for the Claxtons that they had as a partner one who remained and kept the business going after they jettisoned the venture. Since

not one word of censure escaped the lips of Mrs. Claxton while she was active in the business, the criticisms in which she engaged on the witness stand must be deemed afterthoughts. But if the Claxtons really believed that their older partner was excluding them from management, there was available to them more than one remedy. One of the remedies was the enforcement of the rights granted by the statutory provision we just quoted. Another was dissolution of the partnership; it was terminable at will, for reasons, good, bad or non-existent. In short, we reject the charge of constructive expulsion as unfounded.

Notwithstanding the views expressed in preceding paragraphs, we think that the record justifies a conclusion that, through common acquiescence, Mrs. Duncan was recognized as managing partner. See 40 Am. Jur., Partnership, § 115, page 210. The Claxtons expected her to maintain records and supervise operations. In our opinion, she willingly took upon herself those functions. We do not believe that she usurped those functions or excluded the Claxtons from participation in them.

The above will suffice as a delineation of the facts bearing upon the dissolution of the partnership. After those facts had been developed by the witnesses, the presiding judge asked:

"When did dissolution actually take place? Did it take place at the time of this abandonment, at the time these two partners walked out, or did it take place at the time that the case was filed here in court?"

The appellants' counsel replied:

"If the Court please, I think regarding the dissolution that I can agree that the dissolution took place on or about December 16th, 1946."

The respondent's attorney made this observation:

"Yes; there is no question it wrongfully took place then."

Shortly the trial judge remarked:

"I am not going to say the Court agrees with either one of you."

We have quoted the findings of fact which resolved those issues in the trial court. They declare that the partnership was "terminated" on December 16, 1946. We infer that "terminated" was inadvertently used when "dissolved" was intended.

The Uniform Partnership Act (§ 79-101—79-615, O. C. L. A.) does not employ the terms "dissolution" and "termination" as synonyms for each other. It deems that those words have different meanings. A dissolution of a partnership must precede its termination. The order of events is (1) dissolution, (2) winding up, and (3) termination. A dissolution may be brought about by a partner for any of the causes recited in § 79-603, O. C. L. A., (§ 31 Uniform Partnership Act) or by a decree of the court for any of the causes stated in § 79-604, O. C. L. A. (§ 32 Uniform Partnership Act). Dissolution does not terminate the partnership (§ 79-602, O. C. L. A.; § 30 Uniform Partnership Act) and does not end completely the authority of the partners. Termination extinguishes their authority. It is the ultimtae result of the winding up and occurs at the conclusion of the wind up. Dissolution, according to § 79-605, O. C. L. A. (§ 33 Uniform Partnership Act), leaves the partners with authority "as far as may be necessary to wind up partnership affairs or to complete transactions begun but not then finished."

■ The respondent argues that dissolution occurred December 16, 1946, when the Claxtons quit the cafe. The appellants depart from the view they announced near the close of the trial and urge that dissolution did not occur until June 8, 1947, when Mr. Claxton died. It is clear that Mrs. Duncan did not believe, after her partners had left her, that the partnership was dissolved. She took no action whatever toward winding up the business; to the contrary, she conducted the cafe in the same way as previously. When Mrs. Claxton slipped out of the window in the stillness of the night, far from proclaiming a purpose to dissolve the partnership, she did not even say to Mrs. Duncan that she was going. Two days later, when Mr. Claxton left, he expressed an intention to find his wife but none to dissolve the partnership. Matrimonial discord within the Claxton household, not a purpose to dissolve the partnership, underlay the strange incidents of mid-December which we described. After the partners failed to return, Mrs. Duncan could have applied for a decree of dissolution: § 79-604(d), O.C.L.A. (§ 32(d) Uniform Partnership Act). In fact, she would not have been required to resort to court action; she could have dissolved the partnership at any time merely by giving notice. See § 79-603 (1) (b), O. C. L. A. (§ 31 (1) (b) Uniform Partnership Act). She, however, took neither course. Since the partnership was formed for no prescribed term, either or both of the Claxtons from their unknown whereabouts could have dissolved it by giving notice of a purpose so to do, but neither embraced that privilege. We are satisfied that the partnership was still extant June 8, 1947, when Mr. Claxton died. His death *eo instante* dissolved it: § 79-603 (4), O. C. L. A. (§ 31 (4) Uniform Partnership

Act). No court action was necessary to achieve the result wrought by the statute.

■ ■ Having concluded that the partnership was dissolved June 8, 1947, we shall now consider the winding up of the partnership business. Winding up, of course, means the administration of the assets for the purpose of terminating the business and discharging the obligations of the partnership to its creditors and members. In the present instance, the appellants manifest interest only in the discharge of the obligations of the partnership to themselves; that is, an accounting between the former partners.

Oregon Laws, 1943, Chap. 426, § 2, says:

"The surviving partner may continue in possession of the partnership estate, pay its debts, and settle its business."

Section 79-502, O. C. L. A. (§ 25 Uniform Partnership Act), says:

"(1) A partner is co-owner with his partners of specific partnership property, holding as a tenant in partnership.

(2) The incidents of this tenancy are such that:
*  *  *

(4) On the death of a partner his right in specific partnership property vests in the surviving partner or partners, *  *  *."

Although Mrs. Claxton was a surviving partner, she did not seek the responsibility of winding up the partnership business. Apparently, if she had been willing to assume that duty she could have joined Mrs. Duncan in its discharge, but, in lieu of so doing, she permitted Mrs. Duncan to become the sole winding up partner. Therefore, the right to the possession of

all of the partnership property vested in Mrs. Duncan upon the death of Mr. Claxton.

■ Following the death of Mr. Claxton, Mrs. Duncan did not proceed to wind up the business. She explained, ''I thought it had to be settled in court first.'' Such being her impression, she kept the business going and tried thereby to preserve its value for those to whom it would be awarded. She was soon provided with some justification for her belief that ''it had to be settled in court'', for on June 27, 1947, according to the appellants' brief, Mrs. Duncan was informed that ''she was required by law to file with the court a complete and verified inventory of all the assets and liabilities of the partnership within thirty days from the death of Mr. Claxton.'' It was Mrs. Claxton who gave that notice. July 23, 1947, Mrs. Claxton, as administratrix, petitioned the probate court for a citation directing Mrs. Duncan to show cause why she should not file an inventory and provide a bond, or, in the alternative, suffer the appointment of a receiver. The petition was based upon Oregon Laws, 1943, chap. 426. September 4, 1947, after a citation had been served, the probate court entered the requested order. Later, that order was supplanted by another which granted Mrs. Duncan an extension of time to sixty days after the conclusion of this suit in which to file the inventory and appraisement. That order is the subject matter of the first assignment of error. We cannot understand how that phase of the probate proceeding was siphoned into this suit. We are satisfied that that order, whether right or erroneous, can not affect the validity of the decree under attack. The first assignment of error is clearly without merit. However, the proceeding which sought to compel Mrs. Dun-

can to file an inventory and an appraisement brought her face to face with the knowledge that she was required to wind up the partnership. Accordingly, we shall pursue that proceeding a little further.

Oregon Laws, 1943, Chap. 426, § 1, says:

"Within 30 days after the death of a partner the surviving partner shall file a verified inventory of the assets of the partnership in the probate court in which letters testamentary or of administration are issued on the estate of the decedent * * *. The inventory shall state the value of the assets as shown by the books of the partnership and a list of the liabilities of the partnership * * *."

■ ■ As previous paragraphs of this opinion suggest, the partnership had not opened a set of books of account until sometime after July 30, 1947. Even if we deem Mrs. Duncan as the managing partner, she was not responsible for the lack of complete account books, for the partners had never considered some of the entries requisite to such a set of books. An entry essential to such books for this partnership was the value of fixed assets, such as land, improvements, buildings, and cafe equipment. The partners were obliged to pay $16,000 for the place, but during the trial Mrs. Claxton claimed that it was worth not less than $30,000. Obviously, the value of improvements, buildings and equipment determines depreciation,— another item which must be entered in account books.

About a month after Mr. Claxton's death, Mrs. Duncan employed an accountant, Mr. B. K. Herndon, to assist her with her records. We believe that the inference is warranted that one of her purposes was to enable her to wind up the partnership. Mr. Herndon swore that he was employed " to set up and write up

books of account for the Laurel Camp Cafe partnership business." Mr. Herndon's competency is conceded. It is also conceded that "he did his best to make an audit of the records of Laurel Camp Cafe."

Besides setting up for Laurel Camp Cafe a set of books, Mr. Herndon made three analyses of the business. The first of these covers the period of August 12, 1946, to December 16, 1946, the second, the period of December 17, 1946, to July 31, 1947, and the third embraces the period of August 1, 1947, to March 31, 1948. The three span the time from the beginning of the partnership to the month in which the trial was held. All but the third of the computations consist of (1) a statement of receipts and expenditures; (2) a profit and loss statement; and (3) a financial statement. The third, after setting forth assets and liabilities, summarizes profits and losses for the period August 1, 1947, to March 31, 1948.

The suit was tried in two divisions. First, the trial judge heard the testimony concerning dissolution. At its conclusion he ruled that Mrs. Duncan was entitled to a decree of dissolution, and that an accounting should take place. Then a recess was taken, in the course of which there was rendered available to the appellants the mass of papers such as cancelled checks, memorandum books, receipted bills, etc., that we have mentioned. When the appellants had signified that they had familiarized themselves with these documents, the trial was resumed, this time for the purpose of effecting an accounting.

It is the contention of the appellants that Mrs. Duncan did not present for Mr. Herndon's use enough facts and figures to enable him to determine accurately the financial condition of the business. Based upon

that premise, the appellants challenge the competency of his testimony and of the records he compiled. They contend that the cafe property should be sold and that they be awarded two-thirds of the net proceeds. They claim that the property is worth $30,000.

Before Mr. Herndon testified, Mrs. Duncan detailed at length the manner in which she kept records before he was hired. That period began August 12, 1946, when the cafe was purchased, and ended July 30, 1947, when Mr. Herndon began his work. After he entered upon his labors he instructed Mrs. Duncan as to the manner in which she should keep her records, and that being true, we think that we can resort, for the period beginning August 1, 1947, to the set of account books which Mr. Herndon opened.

We shall now attempt to describe the records which Mrs. Duncan kept and delivered to Mr. Herndon. If those records are adequate, his computations may be depended upon; if they do not constitute a sufficient foundation for his deductions, the latter must be discarded. The attack is not upon Mr. Herndon, but upon the adequacy of the records which Mrs. Duncan preserved and gave to him.

According to Mrs. Duncan, no record was ever kept of the total income of the cafe. When the business was acquired the cash register was out of repair and only its till was usable. The cash register was never repaired and, hence, did not register the sales, thereby enabling their total to be computed at the end of the day for the purpose of determining the day's receipts. The waitresses frequently failed to write meal slips and those that were written were not preserved until Mr. Herndon demanded their preservation. Furthermore, customers who were served beer paid for it

without their being made any kind of entry. The only means whereby the income of the business could be computed under those conditions was by adding to the amount of money on hand at the close of the day the total of the bills paid. Mrs. Duncan swore that whenever a bill was paid, unless it represented only a trifling amount for something purchased from a farmer, a statement was required. When a small purchase was made from a farmer a memo was placed in the till showing the amount paid. The statements of all accounts paid were kept by Mrs. Duncan. She conceded that an occasional one may not have come to her hands. All that she possessed were delivered to Mr. Herndon. From the day the cafe was opened and extending to January 22, 1947, Mrs. Duncan, before retiring for the night, entered in a book the amount of cash in the till and all expenditures of which she had knowledge. If an expenditure had been made by someone who failed to secure a receipted bill or to leave a memorandum in the till, it, of course, was not entered in the book. The book to which we are referring is the one to which we have made frequent reference. It reposed in the desk which we have described and was always available to the Claxtons. In general terms the appellants claim inaccuracy and ineptenss in book-keeping, but they have not singled out for cirticism or challenge any entry in the book; nor have they mentioned any entry absent from the book which should be in it. The amount of cash on hand as entered in this book each day was the total in the till and, of course, that amount was the total of the day's receipts less sums paid for milk, bread, meat, etc. The book we are describing was one of those which the appellants examined in the recess period that intervened between

the hearing on the dissolution and the hearing on the accounting. It was likewise one of the records which Mr. Herndon used.

Mrs. Duncan discontinued making the entries described in the preceding paragraph on January 22, 1947. She explained that on that day she suffered a heart attack which confined her to her bed for several days and that shortly after she recovered from that illness her right arm was broken. It will be noticed that when she discontinued making the entries the Claxtons had quit the place and had been absent from it for a month.

Mrs. Duncan kept another book which also reposed in her desk and which was at all times available to the Claxtons. In it were entries showing the amounts of money which the partners had drawn out of the business and the sums which they had contributed to it in addition to the original investment of $1,500 which each partner had made. This book was also used by Mr. Herndon in making his computations. The appellants challenge no entry which appears in it.

When the cafe was opened an account was established in the names of all three partners with a bank located in Grants Pass. The first deposit was $118.83. The bank ledger sheets show that the account never held as much as $400. Some of the checks drawn against it were signed by Mr. Claxton and some by Mrs. Claxton. The parties seem to assume that this account was closed December 16, 1946, after the Claxtons left, but the bank ledger sheets show that the account was still in existence April 8, 1947, although the amount that was then in it approached the vanishing point. April 16, 1947, the account was closed.

December 23, 1946, a new account was opened with the same bank in the name of Edna Duncan, Trustee

for Laurel Camp Cafe. The initial deposit was $200. The bank's ledger sheets show that it was closed May 20, 1947.

During the trial all of the checks, deposit books, check stubs and bank ledger entries concerning the two accounts were received in evidence. They previously had been submitted to the appellants and had been used by Mr. Herndon while he was performing his work.

Mrs. Duncan had a personal account and during the trial the records which comprised it were produced and offered in evidence. The objections of the appellants to the offer were sustained.

After January 21, 1947, when Mrs. Duncan discontinued making entries in the book which we have described, she still continued to preserve the receipted statements, pay roll entries and other papers which came to her hands showing expenditures. By that time the bank accounts were small and not many expenditures were made by checks. However, the deposit books, cancelled checks, check stubs and bank ledger sheets were conserved. All of that material was submitted to the appellants for their examination prior to the hearing upon the accounting and was used by Mr. Herndon when he made his computations.

Mrs. Duncan swore that after January 21, 1947, income never equalled expenditures. Mr. Herndon's figures show that in the period August 12 to December 16, 1946, when the Claxtons worked in the cafe, a loss of $471.49 was sustained. His figures also show that in the period August 1, 1947, to April 1, 1948, when the records were kept under his direction, a loss of $1,361.72 was sustained. As we said, Mrs. Duncan, in giving an impression of the amount of income

in the period January 22, 1947, to August 1, 1947, said that income did not exceed expenditures. Mr. Herndon, in making his computations, accepted Mrs. Duncan's statement and deemed that the income for that period was the equivalent of the expenditures.

All of the receipted statements, cancelled checks, pay roll items, etc., beginning with August 12, 1946, and running down to the month in which the trial was held, were received in evidence. Mr. Herndon used all of those papers when he compiled his data and they had been submitted to the appellants for their scrutiny before the accounting began.

■ The above is a synopsis of the testimony given by Mrs. Duncan concerning the records which she preserved. Her testimony is uncontradicted, with the exception of some given by Mrs. Claxton in which she said that Mrs. Duncan did not welcome interference with her bookkeeping. But no one testified that Mrs. Duncan did not preserve all of the papers which came to her hands showing the financial condition of the cafe. From that statement we must except the meal slips (prior to August 1, 1947), but there is no contention that she discarded them out of bad faith. No one claimed that Mrs. Duncan failed to count and enter correctly the money on hand at the close of the day. If she omitted from the data which she preserved the name of an employee or the amount paid to that person, that fact, seemingly, would have been known to Mrs. Claxton; yet she voiced no claim of such an irregularity. The appellants did not allude to a single voucher which should have been included in Mrs. Duncan's collection of papers, nor did they even intimate that any which she included was subject to question. We think that she, in good faith, kept all statements

of expenditures which came to her hands and entered correctly in her book the daily cash balances.

In appraising the value to an accounting of the collection of papers preserved by Mrs. Duncan, we must bear in mind the fact that at times an employee who paid with cash a statement of account misplaced the latter, and that occasionally a small sum was paid to a farmer by an employee who failed to put in the till a memo of the matter. Instances of that kind, which could not have been many, show that adding to the amount of cash on hand at the close of the day the total of the accounts paid does not always yield a sum which represents the day's income. Normally, in order to decree an accounting, it is necessary to know the amount received by the party who is required to account. In the present instance, we cannot determine accurately from the records kept by Mrs. Duncan prior to August 1, 1947, the amount which came into her hands prior to that day. However, if an accountant had kept the books of the cafe, the accuracy of his work would be subject to the same criticism. In other words, someone might have failed to conserve a bill that had been paid out of the till, or an account might have been paid by someone who failed to leave a memo in the till. Perfect accuracy cannot be hoped for when one has to depend upon human nature, imperfect as it is. The appellants, during the trial, attacked the integrity of Mrs. Duncan, and now argue that some of the partnership money "found its way into Edna Duncan's sock." During the trial not an instance was developed tracing even a single penny to her "sock"; in fact, no attempt was made to do so. Broadsides are not an acceptable substitute for proof. We find nothing in the record which could warrant a belief that Mrs.

Duncan was dishonest or misappropriated partnership money. It is evident that the trial judge believed her and rejected the attacks upon her integrity. We concur in his views.

■ We think it is safe, in proceeding with the accounting, to believe that income was never larger than expenditures, and that in the unrecorded instances in which incomes was larger than the preserved statement of account, the surplus was consumed in payment of bills for which no written memorandum was retained. In the manner just indicated, Mr. Herndon determined the total amount, apart from capital items, for which Mrs. Duncan was required to account. We find that he made no mistake and that the Circuit Court did not err in sustaining that part of his figures. Mr. Herndon's comprehensive analyses of the data supplied by Mrs. Duncan were properly received in evidence: *Carrey v. Haun*, 111 Or. 586, 227 P. 315. Computations of that kind, which enable the trier of facts to find his way around in a labyrinth of figures and papers, serve the same purpose as the needle of a mariner's compass in a storm.

We now come to the capital items. In the set of books which Mr. Herndon opened for the partnership, he entered the property as worth $16,000. He broke up that total as follows: Land, $2,500; land improvements, $2,000; buildings, $10,500; and cafe equipment, $1,000. The appellants claim that the total value of the property was $30,000. As a witness, Mrs. Claxton expressed no opinion upon the subject, but presented evidence which tended to show that while the three partners were operating the business Mrs. Duncan told her that "some people from California wanted to buy it and would give her $30,000." She also swore that Mrs. Duncan

told her that she refused to sell the place. A real estate agent testified that in early December, 1946, he inquired of Mrs. Duncan for the price of the cafe and, "if I am not mistaken, the price was, she said would be $32,000 net to her, as they wasn't ready for a sale, as the other parties had walked out on the deal and it couldn't be sold at that time." Evidently the matter was dropped, but, going on, the witness replied to another question that presently a prospective buyer appeared who said "he couldn't see but $27,000 in the place." The foregoing is the testimony upon which the appellants depend to establish their claim that the property was worth $30,000. Two real estate agents who had been familiar with the property for many years, and who at times were authorized by previous owners to sell it, expressed the belief that it was worth no more than $12,000. Their unsuccessful efforts to sell it at a price more than that certainly lent credence to their opinions. We think that the trial judge did not err against the appellants when he sustained Mr. Herndon's entry of $16,000 as the value of the property.

· We have now approved the method employed by Mr. Herndon in determining the total sum for which Mrs. Duncan was required to account. The Circuit Court took the same view.

We shall now ascertain whether the attacked decree credits the appellants with all sums to which they are entitled, · and credits Mrs. Duncan with anything erroneously.

The pertinent part of § 79-401, O. C. L. A., (§ 18 Uniform Partnership Act) provides:

"The rights and duties of the partners in relation to the partnership shall be determined, subject

to any agreement between them, by the following rules:

(1) Each partner shall be repaid his contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits.

\* \* \*

(3) A partner, who in aid of the partnership makes any payment or advance beyond the amount of capital which he agreed to contribute, shall be paid interest from the date of the payment or advance.

(6) No partner is entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs.

\* \* \*''

There is no claim that Mr. Herndon's figures and the attacked decree do not credit the appellants with all sums required by that section of our laws. But the appellants challenge the part of the accounting which awarded Mrs. Duncan compensation at the rate of $200 per month for unusual services performed by her after December 16, 1946, when the Claxtons quit the business.

■ We saw from our quotation from § 79-401, O. C. L. A., that "No partner is entitled to remuneration for acting in the partnership business". It may seem unjust to deny compensation to a dutiful partner who remained faithful to the business after the other partners had quit it and had accepted gainful employment at other places, but the remedy for such a situation

is dissolution of the partnership. Section 79-401, going on, says that "a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs." Accordingly, Mrs. Duncan was entitled to compensation for whatever she did "in winding up the partnership affairs." July 30, 1947, she engaged Mr. Herndon's services to make an accounting of the data she had preserved from the inception of the business, so that an accounting, preliminary to a winding up of the partnership business, would be possible. About the same time she was met with orders issued by the probate court demanding of her that she file an accounting or suffer a receivership to be appointed for the business. As we have seen, it was impossible for her to comply with the demands. The fault was not hers alone. Faced with those demands, she filed this suit. We think that on August 1, 1947, Mrs. Duncan began the work of winding up the business. It is true that after that day she continued to operate the cafe as a going concern, but we do not believe that it was essential to a winding up of the business that she should at once lock the doors of the place and offer the latter for sale. We assume that a locking of the doors would have been disastrous to the value of the property. The Circuit Court, so we find, should not have computed Mrs. Duncan's compensation from December 16, 1946, but from August 1, 1947.

The Circuit Court disallowed the entries made by Mr. Herndon for depreciation under an explanation that "depreciation is a matter of bookkeeping, and the appraisal is to be based upon the actual value of the property." Mr. Herndon made his allowances of depreciation upon buildings, land improvement and cafe

equipment. By land improvement we mean such items as sewage installations and the water system. Mr. Herndon swore that his depreciation was computed upon "the estimated life of the depreciable assets" and that in making his calculations he followed the customary procedure. No one gave testimony adverse to his. We think that the court erred in disregarding his testimony and in striking out the allowances.

The above reviews all items in the Circuit Court's accounting that need mention. The last of the assignments of error is based upon a contention that the trial court erred in finding that the business was operated at a loss from August 12, 1946, to March 31, 1948. In making that determination, the trial judge was influenced largely by Mr. Herndon's computations. He, however, disallowed some of Mr. Herndon's items, such as depreciation, but added the allowance to Mrs. Duncan for compensation from December 16, 1946, which we have mentioned. We have analyzed Mr. Herndon's figures carefully and think that he did not err when he found that the business was operated at a loss from the day the partnership began operations. The adjustments made by the trial judge did not materially alter the situation. The major part of the loss was accounted for by two items: (1) depreciation, and (2) unpaid but accrued wages. As we have said, the depreciation was properly chargeable in determining the financial status of the business. The unpaid and accrued wages were due two employees, one of whom was Mrs. Hartley and the other a Mr. Corey. The trial judge held that nothing was due Mr. Corey, and we concur in that conclusion. He reduced Mrs. Hartley's claim to $1,430, with the apparent approval of the respondent. Yet, after those adjustments have

been made, a loss remains. We find no merit in the contentions that underlie this assignment of error.

■ The above disposes of all of the contentions upon which the assignments of error are based. The Circuit Court erred when it made an allowance for Mrs. Duncan for the work which she performed in the winding up for the period beginning December 16, 1946. That allowance should have been computed from August 1, 1947. It also erred when it struck out the depreciation allowances. In all other respects, the decree of the Circuit Court is affirmed. The amount of the depreciation reserve, $1,585.98, which the Circuit Court erroneously disallowed, is virtually the same as the excessive compensation which it awarded to Mrs. Duncan. Thus, its decree is "approximately correct" within the principle applied in *Abrams v. Rushlight*, 157 Or. 53, 69 P. 2d 1063, which holds that no cross-appeal is essential to the allowance of errors adverse to the respondent when they approximately balance errors in computations made favorable to the appellant.

The cause is remanded with instructions to enter a new decree in harmony with the above determinations. Costs and disbursements will be allowed to neither party.