Argued June 2, affirmed as modified; remanded August 7, 1975

# TIMMERMANN, *Appellant, v.*
# TIMMERMANN ET AL, *Respondents.*

### 538 P2d 1254

*James H. Clarke,* of Dezendorf, Spears, Lubersky & Campbell, Portland, argued the cause and filed the briefs for appellant.

*Alex M. Byler,* of Corey, Byler & Rew, Pendleton, argued the cause and filed a brief for respondents.

HOWELL, J.

This is a suit in equity for an accounting and for the winding up and termination of the farming partnership of Timmermann and Company. The trial court found that the partnership was dissolved by plaintiff, Lynne Timmermann, on August 31, 1970. The court

further held that plaintiff, by delay in bringing about a forced liquidation, elected to become a creditor of the partnership under ORS 68.640. Thus plaintiff was entitled to receive, at his option, either the value of his interest in the partnership as of the date of dissolution plus interest at the legal rate or profits attributable to the use of his right in the property of the dissolved partnership. Following completion of the accounting the court ordered the plaintiff to make his election as provided in ORS 68.640 and ordered the partnership terminated.

Plaintiff appeals, alleging that the court erred (1) in not ordering a winding up and distribution of the partnership assets in equal shares; (2) in finding that the partnership was dissolved on August 31, 1970, rather than on May 15, 1972, the date plaintiff gave his "notice of termination"; and (3) in approving defendants' revised accounting. Defendants cross appeal, alleging that the court erred (1) in finding that the partnership was dissolved on August 31, 1970, rather than August 31, 1969, when plaintiff allegedly told defendants he was leaving the partnership, and (2) in modifying defendants' original accounting.

## BACKGROUND OF THE PARTNERSHIP

On January 2, 1958, the partnership of Timmermann and Company was organized for the purpose of farming grain and peas. The partners were Ernest and Sylvia Timmermann and their two sons, Stanley and Lynne. The parents had been farming in Umatilla County since 1932 and desired to bring their sons into the business.

Under the written partnership agreement, Ernest was to provide management and advice to the partnership, and Sylvia was to keep the books. Neither was required to provide labor in connection with the farm-

ing operation. Stanley and Lynne were required to "contribute all of their time and energy to the partnership operation, including personal service and labor" and to "only engage in other pursuits that will not interfere with the operation of said partnership, or will not compete therewith." The partnership had the right to farm any land acquired or leased by any partner. The title, however, to the lands remained in the individual partners and did not become partnership property. All partners were to share equally in the profits and losses. The partnership agreement also provided:

"In case of the determination [sic] of the partnership from whatever cause, the parties hereto agree to and with each other, that they will make a true, just and final settlement and final account of all things relating to their said business, and in all things truly adjust the same. And after all the affairs of the partnership are adjusted, its debts paid off and discharged, then all of the properties, as well as the gains and increases which shall appear to be remaining, either in money, goods, wares, property, fixtures, debts or otherwise, shall be divided equally * * *."

The above-mentioned partnership agreement was to run for five years. In February 1963 the partners executed an agreement extending the life of the partnership to December 31, 1967. With certain exceptions the partnership agreement remained the same. One of the exceptions was that any partner could terminate the agreement upon the giving of written notice. The extension agreement expired on December 31, 1967. Thereafter the partners continued their farming activities without a written agreement. Sylvia Timmermann died in September 1968 and left her partnership interest to her husband and sons. After Sylvia's death the remaining partners continued operation of the ranches.

Between 1965 and 1967 the partnership greatly increased the amount of land which was owned or leased for farm purposes. The partners, in their individual names, purchased the Harvey and Christopher lands. The partnership leased additional Harvey property, about 1,000 acres of Indian land, and the 5,000-acre Pearson ranch. With the expansion of the partnership property, Stanley and Lynne divided the duties of farming along geographic lines, with Lynne assuming responsibility for the Pearson ranch. Each son was doing approximately half the work of the partnership and, although farm equipment was shared, each operated virtually independent of the other.

The expansion necessitated the borrowing of substantial capital. From 1967 through 1971 the partnership was unable to fully repay its annual operating loan from the bank. In 1968 and 1969 the partnership suffered financial losses of $49,509 and $19,456 due primarily to poor crops. In 1970 and 1971 the partnership was further hurt by depressed prices. At the time of her death in 1968, Sylvia's one-fourth interest in the partnership was valued at only $4,132.97.

Due to the serious financial problem, it was necessary to reduce the amount of land being farmed by the partnership. The Pearson lease was terminated after the 1970 harvest. The Indian leases were also terminated and two additional leases were not renewed. As a result of this reduction, the property farmed by the partnership consisted of about 5,000 acres, all of which had previously been the responsibility of Stanley.

In the meantime, in 1967 Lynne started a truck sales business known as Tim's Trucks. At first the business was run from one of the partnership farms. However, in 1968 Lynne acquired land in Pendleton upon which he developed a truck sales and service fa-

cility. In March 1969 he incorporated the business and moved to the new location. The truck business was profitable for Lynne and demanded substantial amounts of his time. His 1970 tax return for the business indicated that he devoted "part" time to the truck business, while his 1971 return indicated that he devoted "full" time.

Following the 1970 harvest, Lynne did not actively engage in farming. His primary contribution to the partnership after this time was to collect some surplus equipment from the Pearson ranch and sell it on his truck sales lot in Pendleton. These sales were made with some help from his brother and father, and Lynne did not charge the partnership a commission.

In 1971 the partners began to hold infrequent discussions on the settlement of partnership affairs. These discussions were unsuccessful and, on May 15, 1972, Lynne gave notice of termination and filed the present suit for an accounting.

## ON THE MERITS

As a preliminary matter, it is necessary to decide whether Timmermann and Company was governed by the written partnership agreements of 1958 and 1963. At trial plaintiff took the position that the partnership agreement was not in writing but was based upon an oral understanding between the parties. On appeal he takes the position that the written agreement governs the rights of the partners. At trial defendants took the position that there was an oral agreement to continue the partnership under the written partnership agreement. On appeal they take the position that after 1967 the partnership was not controlled by the former partnership agreement.

■ As noted above, the written partnership agreement was to end on December 31, 1967. After that date

the partners continued operations in some form until the death of Sylvia in 1968. Her death caused a dissolution of the then-existing partnership under ORS 68.-530(4), Uniform Partnership Act (UPA) § 31. *See Duncan v. Bartle et al,* 188 Or 451, 216 P2d 1005 (1950). A partnership between the father and two sons continued after that date. The question is thus not whether the 1958 partnership was continued under the written agreement but, rather, whether the new partnership of Ernest, Stanley and Lynne orally agreed to be governed by the terms of the old written agreement.

At trial Lynne testified that the partnership, in its original form, quit functioning either at the expiration of the written agreement, at his mother's death, or at the time the partnership began to lose money. He testified that after 1967 "the whole structure changed, three times as many acres, new managers, separate operations, very little semblance with the original partnership." He made no suggestion to the other partners that the old partnership agreement be extended after the death of his mother.

Stanley and Ernest testified at trial that, after the expiration of the written agreement and after the death of Sylvia, the partners continued operation under the old written agreement. Stanley described this as "an oral extension of the 1958 [agreement] and the 1963 extension." Ernest testified that, after his wife's death, the partnership continued in the same manner.

Neither the testimony of Lynne nor the testimony of Stanley and Ernest is persuasive, particularly in light of the fact that each party has taken a position on appeal which is in direct contradiction to his position at trial. Likewise, the testimony of other witnesses is ambiguous on the question of whether the partnership was to be governed by the written agreement.

Viewing the limited evidence, we feel that after the

expiration of the written agreement and the death of Sylvia the partnership changed greatly and was no longer governed by the terms of the written partnership agreement. The partnership agreement had, by its terms, expired and there was no effort to execute an extension agreement. One of the original partners had died, causing a dissolution of the original partnership and a distribution of profits in a ratio different from that contemplated in the written agreement. ORS 68.530. The working relationship between the partners had changed, with Stanley and Lynne assuming most of the management and bookkeeping duties in contravention of the written agreement.

■ As this partnership was not governed by the terms of a written partnership agreement, the subsequent dissolution and termination thereof is governed by the Uniform Partnership Act, ORS ch 68, and any other agreements between the parties.

Both plaintiff and defendants assign as error the trial court's finding that the partnership was dissolved on August 31, 1970. Plaintiff asserts that the partnership was dissolved on May 15, 1972, and defendants assert that the partnership was dissolved on August 31, 1969.

Leasing the Pearson ranch in 1967 almost doubled the amount of land being farmed by the partnership. The lease was to run from 1967 to 1971 and was terminable at an earlier date if it should become economically unproductive. As noted above, Lynne was to devote his time to farming the Pearson ranch, while Stanley farmed the other partnership property.

In late harvest of 1969, when the partnership was plagued with financial problems, Lynne stated to his partners that he was going to get out of farming and the partnership. Lynne testified that he had made such a statement, but he was merely referring to getting

out of farming at the Pearson ranch. He further testified that he had made numerous statements about getting out of the partnership since 1967, and that his brother and father had made similar statements.

In 1969 the partners decided to terminate the Pearson lease because it had become economically unproductive. On January 14, 1970, the partners met with the landlord and his attorney and agreed to the termination, effective after the 1970 harvest. Lynne continued farming the Pearson land until the termination of the lease was effective. After the 1970 harvest Lynne's only contribution to the partnership was the sale of certain partnership equipment at his truck sales lot in Pendleton.

Following the cessation of Lynne's farming activities, certain unsuccessful negotiations were held to discuss the dissolution, winding up and termination of the partnership. On May 15, 1972 Lynne gave "notice of termination" of the partnership and, the following day, filed this suit.

■ A partnership at will may be dissolved without violation of the agreement between the partners by the express will of any partner when no definite term or particular undertaking is specified. ORS 68.530(1)(b), UPA § 31(1)(b). The dissolution may be accomplished by giving notice to the other parties and no particular form of notice is required. *McKinnis v. Dodge et al,* 103 Or 9, 13, 203 P 876 (1922). Also the notice of dissolution may be express or it may be implied from circumstances which are inconsistent with the continuation of the partnership. *See* 1 Rowley on Partnership 585, § 31.1(b) (2d ed 1960).

■■ In the instant case, we agree with the finding of the trial court that the statement by Lynne in 1969 that he was leaving the partnership and leaving farming did not dissolve the partnership. Rather, that

statement served as notice to the other partners of Lynne's intent to withdraw.[1] Lynne accomplished the dissolution on August 31, 1970, when he ceased to participate in the farming activities of the partnership.[2]

Plaintiff's next assignment of error contends that the trial court erred in failing to order the winding up of the partnership and the distribution of its assets or their proceeds to the partners in equal shares. The court ruled that the plaintiff had acquiesced in the continuation of the partnership after its dissolution and thus had elected to be treated as a creditor of the partnership under ORS 68.640,[3] UPA § 42. The court

---

[1] Defendants attempt to designate plaintiff's activities after August 31, 1969, as being "solely to wind up the partnership business." "Winding up" as used in ORS ch 68 is "the entire process of settling partnership affairs after dissolution." 1 Rowley on Partnership 663, § 37.0 (2d ed 1960). Winding up is the activity which takes place prior to the termination of the partnership and is inconsistent with the continuation of a partnership, as in the instant case.

[2] Our holding is not inconsistent with the case of Duncan v. Bartle et al, 188 Or 451, 216 P2d 1005 (1960), where this court held that a partnership was not dissolved where one of the partners merely abandoned the operation with no notice. In the instant case plaintiff gave notice of his intent and then remained with the partnership for one more year until the lease on the Pearson ranch was terminated.

[3] ORS 68.640 provides:

"When any partner retires or dies, and the business is continued under any of the conditions set forth in subsection (1), (2), (3), (5) or (6) of ORS 68.630, or paragraph (b) of subsection (2) of ORS 68.600, without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; provided that the creditors of the dissolved partnership as against the separate creditors, or the

based this ruling on its finding that the plaintiff had waited two and one-half years after he gave his notice of intent to withdraw, and one and one-half years after he actually withdrew before attempting to bring about a forced liquidation of the partnership through this suit.

■■ In dealing with this problem it is necessary to remember that "[t]here are three separate steps necessary for the complete extinguishment of an existing partnership. They are (1) Dissolution, (2) Winding up, and (3) Termination." *Claude v. Claude,* 191 Or 308, 328, 228 P2d 776, 230 P2d 211 (1951). Dissolution is defined as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." ORS 68.510, UPA § 29. Dissolution alone does not act to terminate the partnership but rather "designates the point in time when the partners cease to carry on the business together." Official Comment, Uniform Partnership Act, 6 ULA 365, § 29 (1969). As noted above, the partnership of Timmermann and Company was dissolved on August 31, 1970.

■ Upon dissolution, a withdrawing partner who has not breached the partnership agreement has certain options with regard to his interest in the dissolved partnership. First, he may require the partnership be wound up and terminated. Upon the exercise of this option the partnership is liquidated and the assets are distributed among the partners. ORS 68.600, UPA § 38. In the alternative, the withdrawing partner may allow the business to continue or accept the fact that it has continued. Crane and Bromberg, Law of Partnership 495, § 86(c) (1968).

representative of the retired or deceased partner, shall have priority on any claim arising under this section, as provided by subsection (8) of ORS 68.630."

■ If the withdrawing partner allows the business to continue, the value of his interest in the partnership as of the date of dissolution is ascertained. He then has the right to receive, at his option after an accounting, either the value of his interest in the partnership with interest or, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership. ORS 68.640, UPA § 42. *See* Crane and Bromberg, supra;[4] 1 Rowley on Partnership 805, § 42.0 (2d ed 1960).

12. In the instant case the facts clearly support the trial court's finding that the plaintiff, by allowing the partnership to continue, elected to be treated as a creditor of the partnership under ORS 68.640, UPA § 42. Plaintiff is not entitled to withdraw from a failing partnership on the brink of insolvency, allow the other partners to continue the business for one and one-half years until the economic picture improves, and then force a liquidation and receive an equal share of the profits when he has not contributed his share of the labor during the time the profits were made.

## THE ACCOUNTING

■ Both plaintiff and defendants raise objections to the accounting as finally approved by the court. In considering this question, the ultimate goal of the ac-

---

[4] "[The withdrawing partner] can permit the business to continue (or accept the fact that it has continued) and claim as a creditor (though subordinate to outside creditors) the value of his interest at dissolution. This gives him a participation in all values at dissolution, including asset appreciation and good will, and means he is unaffected by later changes in those values. If he takes the latter route, he has a *second election* to receive in addition either interest (presumably at the local legal rate) or profits from date of dissolution. This second election shields him from losses, at least vis-a-vis the continuing partners. He need not make the second election until an accounting has disclosed the comparative figures and he sees which is more favorable to him." Crane and Bromberg, Law of Partnership 496-497, § 86 (1968). (Emphasis in original; footnotes omitted.)

counting is to ascertain the value of the plaintiff's interest in the partnership as of the date of dissolution and then determine the "profits attributable to the use of [plaintiff's] right in the property of the dissolved partnership." ORS 68.640, UPA § 42. We also note that mathematical certainty is impossible when valuing interests in a partnership and our task, within the confines of ORS 68.640, is to treat all parties equitably.

Based upon defendant's accounting, the court found Lynne's interest in the partnership as of the date of dissolution (August 31, 1970) to be $37,087, or approximately one-third of the total.[6] During the period from August 31, 1970, to November 23, 1973,[7] the partnership made profits totalling $334,079. Of these profits, the court determined that the use of Lynne's right in the property of the partnership accounted for $39,200, or 11½% of the total.

Plaintiff objects to defendants' accounting formula on three main grounds. First, he contends that profits attributable to the use of borrowed capital should be allocated equally to all three partners. Second, he objects to any allowance for labor and management services of Stanley and Ernest after dissolution. Third, he objects to the formula by which defendants' accountant determined that portion of profits attributable to the use of capital.

With regard to plaintiff's first objection, the accounting valued Lynne's right in the property of the partnership at approximately one-third of the total as of the day of dissolution. With the inflow of borrowed capital the value of Lynne's right in the property

---

[6] Actually, Lynne's interest was slightly higher than one-third. Lynne and Stanley had interests of $37,087 each. Ernest's interest was $35,622.

[7] November 23, 1973 was the date of the accounting.

of the partnership was reduced proportionately.[7] We feel that this reduction was improper.

■ Absent an agreement to the contrary, during the life of a partnership the partners will share in the profits of the business equally. ORS 68.310(1), UPA § 18(a). This situation changes if the partnership is dissolved and the business is continued by one or more of the former partners. Where the business is continued, the withdrawing partner is generally entitled to share in profits in proportion to his rights in the property of the partnership. *Vangel v. Vangel,* 45 Cal 2d 804, 291 P2d 25, 28, 55 ALR2d 1385 (1955); *Schoeller v. Schoeller,* 497 SW2d 860 (Mo App 1973).

■ We have found no authority which would allow for the reduction of the withdrawing partner's share of the assets of the partnership because of an inflow of borrowed capital. In the instant case, the procedure was apparently justified on the grounds that a certain portion of the profits was attributable to the use of borrowed capital and thus could not be attributable to the use of Lynne's rights in the property of the partnership. Such a theory ignores the fact that Lynne's rights in the property of the partnership equalled approximately one-third of the assets of the partnership. Such assets undoubtedly provided the collateral for the loans in question. Insofar as the profits which are created through the use of borrowed capital are attributable to any partner's share, they are attributable to all in proportion to their share of the assets.

■ Plaintiff's second contention, that the accounting should have made no allowance to Stanley and Ernest for their labor and management after dissolution, is incorrect. Although this question has never be-

---

[7] In 1971, 1972 and 1973 (to November 23) plaintiff's interest was valued at 33.02%, 27.3% and 24.4% respectively. It is not clear what part of this reduction came from the addition of borrowed capital.

fore directly arisen in Oregon, we feel that one who continues the partnership business after dissolution and contributes substantial labor and management services thereto is entitled to compensation for that share of the profits which are attributable to such services. Such a rule is compatible with ORS 68.640, which allows a retiring partner only those "profits attributable to the use of his right in the property." Thus, he should have no interest in profits attributable to the labor and management services of the continuing partners.

The above rule is in accord with the better reasoned decisions from other jurisdictions. As stated in *Essay v. Essay,* 175 Neb 730, 123 NW2d 648, 649 (1963):

> "* * * Where the profits earned after dissolution and before a final accounting are attributable in part to the personal skill or services of a partner, it is a factor to be considered in the apportioning of the shares of the partners."

1 Rowley on Partnership 814, 815, § 42.3 (2d ed 1960) states:

> "* * * The best considered authorities hold that the former partner or his estate is entitled to the profits which were earned by his share of the assets, or according to his share of the capital, after deducting such share as is attributable to the skill and services of those who have continued to carry on the business.

> "* * * If the business is continued by consent of those who are entitled to an account and they elect to take profits, the partner who so continues the business is usually held to be entitled to compensation * * *."

*See also Schoeller v. Schoeller,* supra, noted in 39 Mo L Rev 632 (1974); *Bracht v. Connell,* 313 Pa 397, 170 A 297 (1933); Annot., 55 ALR2d 1391, 1416, 1423

(1957). But see *Wikstrom v. Davis,* 211 Or 254, 281, 315 P2d 597 (1957).⑧

In *Vangel v. Vangel,* supra 291 P2d at 28, the California Supreme Court discussed the related question of allowing compensation for a withdrawing partner who continued to render valuable services in the operation of a citrus farm. The court said:

"* * * As a practical matter, his share of the profits usually is computed on the basis of the ratio that his share of the partnership assets bears to the whole of them. [Citing authority.] However, that division may not be equitable when the contribution to profits from capital is relatively minor in comparison to the contribution from the skills or services of one conducting the business. In such a case, the managing partner may be entitled to a greater share of the profits. [Citing authority.] Although such a method of dividing profits is usually spoken of in terms of providing extra compensation for the managing ex-partner, in reality it merely reflects the statutory requirement that the retired or deceased partner be allowed the profits *attributable* to his right in the assets used in the business." (Emphasis in original.)

■ In summary, we find that a trial court, in determining profits attributable to the use of a withdrawing partner's right in the property of the dissolved partnership, is entitled to make an equitable allowance for the services of the continuing partners.

Plaintiff's third objection, that defendants' account-

---

⑧ Wikstrom v. Davis, 211 Or 254, 315 P2d 597 (1957), is clearly distinguishable from the instant case. In that case the court refused to allow compensation to partners who expelled plaintiff and continued business without his consent. This accords with the general rule denying compensation when the partnership is *wrongfully* continued. *See* 1 Rowley on Partnership 815, § 42.3 (2d ed 1960). For a discussion of *Wikstrom see* Schoeller v. Schoeller, 497 SW2d 860, 870 (Mo App 1973).

ant used an improper formula to determine that portion of the profits attributable to the use of capital, is well taken. The accountant used a formula whereby he first determined the "yield" from the total capital employed. He did this by taking the total income of the partnership and dividing it by the total capital employed. He then took the "yield" figure and multiplied it by the total income of the partnership and arrived at a product which he designated "income created by capital." Finally, Lynne's proportional share of this figure was determined.[9]

■ It was error for the trial court to use defendants' formula. In the first place, there was no evidence which would support the assumption that the yield on capital employed multiplied by the total income of the partnership would give the income created by capital. A second accountant, also called by defendants, testified that defendants' accounting formula was "entirely unconventional." He further testifed that "under generally accepted accounting principles, it lacks objectivity." Plaintiff's accountant testified that the ra-

---

[9] The formula was as follows:

**1971**
$14,468 (total income) ÷ 179,834 (total capital employed)= 8.1% "yield"
8.1% "yield" X 14,468 (total income)=$1,172 (income created by capital)
$1,172 X 33.02% (Lynne's share)=$389 (income attributable to Lynne) or 2.7% of total

**1972**
$65,775 ÷ 172,338=38.16%
38.16% X 65,775=$25,100
$25,100 X 27.3%=$6,852 (income to Lynne) or 10.4% of total

**1973 (From Jan. 1 to Nov. 23)**
$253,836 ÷ 492,146=51.6%
51.6% X 253,836=$130,979
$130,979 X 24.4%=$31,959 (income to Lynne) or 12½% of total

Total profits=$334,079
Total profits to Lynne=$39,200, or 11.7% of total

tio employed by defendants "means absolutely nothing."

In the second place, the formula failed to allow the plaintiff sufficient participation in those profits which could not easily be attributed to any one individual's capital contribution, such as weather, rapidly increasing wheat prices throughout the area, and the use of land held in the names of all three partners. To say that plaintiff may be allowed only profits attributable to the use of his rights in the property of the dissolved partnership is merely another way of allowing defendants extra compensation for their valuable management and labor services to the partnership. To further allow defendants all the profits which may be attributable to such intangibles as luck and the weather would be an unwarranted extension of the statute. These profits, to the extent they can be attributed to anything, are attributable to capital employed by each partner.

■ An accounting to determine the profits attributable to the use of Lynne's rights in the property of the partnership should allocate to plaintiff his proportional share of the total profits of the partnership less compensation to the continuing partners for their services to the partnership after dissolution. Thus, it will be necessary for the trial court to hold a hearing and determine the value of each continuing partner's services to the partnership.

> "* * * The court below must determine what is the fair value of such services by a consideration of the nature of the work, the time spent, and the skill used." *Bracht v. Connell,* supra 170 A at 300.

The trial court should allow a sum for each continuing partner from the date of dissolution to the date of the accounting to be subtracted from the total profits

of the partnership.[10] Plaintiff should then be allocated his proportional share (33.78%) of the remaining profits. By the use of such method, defendants will be compensated for their services to the partnership and plaintiff will receive the profits attributable to the use of his right in the property of the partnership.

As this case must be remanded for an additional accounting, we shall deal with other objections raised by both parties.

■ Plaintiff objects to the trial court's decision to treat as withdrawals from Lynne's capital account personal expenses which he charged to the partnership after August 31, 1970. Plaintiff contends that it is inequitable to charge these expenses against Lynne and not to charge similar expenses against Stanley and Ernest. It is true that each partner had customarily charged personal expenses to the partnership. However, that partnership was dissolved on August 31, 1970. After that date Lynne was a creditor of the partnership, ORS 68.640, and as such he was not entitled to charge his personal expenses to the partnership, regardless of prior custom. The court correctly treated personal expenses charged to the partnership after dissolution as withdrawals from Lynne's capital account.

■ Plaintiff next objects to what he terms "defendants' manipulation of the accounts by holding over the 1973 crop." In 1973 the defendants did not sell their crop. Rather, they held it over until the next year. As the accounting period ended on November 23, 1973, this holding-over resulted in the 1973 crop being shown

[10] The value of defendant's services during that period should not be based upon wages normally paid for truck drivers or tractor operators; however, due consideration should be given to the extensive and substantial knowledge and experience of the defendants as owners and operators of a large ranching operation.

on the books of the partnership as an inventory asset. Lynne received credit for his share of this asset. However, he contends that, had defendants sold their crop in the year of harvest, as had been the practice in the past, the money realized from the sale of the crop would have been used to pay off the partnership debt and thus increase plaintiff's proportion of the profits. Plaintiff presented no evidence that it was unreasonable to hold over the 1973 crop. On the contrary, there was evidence of rapidly rising wheat prices. Thus, it may have been economically desirable to hold the crop over. Furthermore, plaintiff presented no evidence as to when the 1973 crop should have been sold and what the appropriate price would have been. In the absence of this evidence, we find no error in the trial court's treatment of the 1973 crop.

■ Plaintiff also objects on appeal to the court's failure to include in the balance sheet of the partnership the value of the expectation of renewal of farm leases and of the continuing right to farm the separate lands of the partners. We cannot consider this objection to the accounting. Plaintiff failed to object to the failure to include this "asset" in the accounting. Furthermore, plaintiff did not introduce evidence as to the value of the expectation of renewal of leases or the right to farm the separate lands of the partners.[10]

■ Finally, plaintiff objects to the failure of the court to require defendants to indemnify Lynne against liability for debts of the partnership. Again, we cannot consider this objection. Plaintiff has cited no evidence, and we have found none, which would show that the court was ever asked to require the defendants to indemnify Lynne.

---

[10] Of course, plaintiff did receive return on the partnership renewal of leases and use of partners' land after dissolution in that he had the rights to certain profits from the use of that land.

In their cross-appeal the defendants allege that the trial court erred in failing to charge Lynne's partnership equity with the sum of $16,374, which constituted the amount received from the sale and rental of excess partnership equipment. This money was deposited in the bank account of Tim's Trucks, Inc. Defendants allege that the sum is due from plaintiff personally. Plaintiff contends, and the court agreed, that the sum was due from Tim's Trucks, Inc., and was not chargeable against Lynne's equity.

Lynne set up an account for the partnership with Tim's Trucks in 1969, a few months after he incorporated his truck business. As he sold equipment (using the facilities of Tim's Trucks, Inc., primarily) he would deposit the proceeds in either the partnership account or the account of Tim's Trucks. The account appears to have been for the convenience of both the partnership and Tim's Trucks.

■ The evidence on this question is rather inconclusive. The confusion appears to have been caused by the generally lax bookkeeping methods of the partnership. We feel that the trial judge was correct in his finding that the sum was due from Tim's Trucks rather than from Lynne personally.

■ Finally, defendants contend that the court erred in its valuation of the growing crops as of November 23, 1973. The court ruled that the value of the growing crops was 50% of the average three-year yield times the contract market price on the date of valuation. Defendants contend that the growing crops have a value equal only to the cost invested in them at the date of valuation. We agree with the finding of the trial court as to the valuation of the growing crops. Each side presented experts who supported their position. The plaintiff's expert, a well-qualified rancher and physician from Pilot Rock, testified that the above

formula was employed by farmers borrowing money. Defendants' experts testified that when selling a farm the growing crop is valued according to the cost invested. We agree with the valuation used by the trial court. We are not dealing with the sale of land upon which crops are growing. Rather, we are attempting to put a value on planted crops as of a specific date. A formula which would deny those crops any value over the expense in them is inequitable.

Affirmed as modified and remanded for a determination of plaintiff's share of the profits from the date of the dissolution to the date of the accounting.