Argued and submitted July 19, 1991, affirmed February 12, 1992

Steven GRASSER,
*Appellant,*

*v.*

Jeffrey S. McLAUGHLIN,
*Respondent.*

(85-0816C; CA A65505)

826 P2d 2

C. Thomas Davis, Beaverton, argued the cause and filed the brief for appellant.

Russell Lipetzky, Salem, argued the cause for respondent. With him on the brief was Saucy & Lipetzky, P.C., Salem.

Before Warren, Presiding Judge, and Joseph, Chief Judge, and Edmonds, Judge.

JOSEPH, C. J.

## JOSEPH, C. J.

In this action for an accounting and for dissolution of a partnership and distribution of partnership assets, plaintiff assigns error to the trial court's allocation of business expenses in calculating partnership profits and its failure to allocate to him any profits attributable to his interest in the partnership business that continued after dissolution. We review *de novo*, ORS 19.125(3), and affirm.

The parties orally formed their partnership, Pacific Insurance Associates (PIA), in May, 1980, to sell supplemental health insurance policies as a general agent. Partnership income was earned by collecting "overwrites"[1] from policies sold by PIA's subagents. The partners agreed to share partnership profits equally, but each would retain the commissions on his own sales. The business initially operated out of defendant's home. Although the partners never formally decided what duties each would perform, defendant did the record keeping and accounting. Both participated in hiring and supervising subagents, and both contributed small amounts of cash to pay minor expenses as they arose. By 1982, PIA had hired approximately 20 subagents, who primarily sold policies for 4 insurers.

Sometime in 1982, the partners decided to enlarge the territory in which PIA was authorized to sell policies. They first considered acquiring exclusive authority to sell policies in Pocatello, Idaho, for Life Investors Insurance Company. They met with that company's regional vice-president, who informed them that, although they could conduct business as a partnership, one partner would have to move to Pocatello to manage the office there. Plaintiff testified: "We played a game of gin to decide who went and I lost." After plaintiff visited the office in Pocatello, however, the partners decided that they would not take on that territory.

Later the partners learned that Investors Insurance Corporation (Investors), for which they were selling policies in Oregon, had an exclusive sales territory available in Washington. Investors, however, would not allow a general agency

---

[1] An "overwrite" takes 2 forms in this context: a percentage of a subagent's commission earned on the initial sale of a policy; and a percentage of a payment made to renew an existing policy.

to control territory in both states. The partners agreed to create the appearance of dissolving the partnership in order to obtain the territory in Washington.[2] They decided that plaintiff would move to Spokane to establish an office there. He moved in April, 1982, and opened a bank account under the name Inland Northwest Insurance Service.

In September, 1982, defendant became the regional sales representative for National Foundation Life Insurance Company (NFL). Overwrites on policies written for that company were not partnerships assets.[3] Nevertheless, defendant used the PIA bank account for NFL business and followed no systematic procedure to separate partnership from non-partnership records.

Investors eventually changed its commission disbursement procedures, raised its premiums and implemented a more restrictive underwriting policy. Sales of its policies declined sharply as a result. The employees working in Spokane — including plaintiff — began selling NFL policies as subagents for defendant. In June, 1983, the parties met to discuss the dissolution of their partnership. They reached no agreement, however, and both continued to work for and receive compensation from the partnership. In June, 1985, plaintiff filed the complaint in this action. He formed a separate insurance agency in February, 1986. The trial court

---

[2] At trial, defendant argued that they intended to dissolve the partnership at that time and points to an office party and a watch that he gave plaintiff as a going away gift as evidence of that intent. Although defendant did not cross-assign error to the trial court's finding that the purported partnership dissolution was merely a charade, his brief contains a supplementary statement of facts that conflicts with that finding. We, therefore, note that we agree with the trial court's finding on that issue. The initial capital for the Spokane office came from PIA; PIA was licensed to sell insurance in both Washington and Oregon, and the Spokane agents sold insurance under the PIA license; the parties maintained regular and frequent telephone contact to discuss the business; defendant continued to send plaintiff monthly checks written on the PIA account; and, although defendant's record keeping was abysmal, the IRS 1099 forms that defendant was able to produce as evidence demonstrate that overwrites from at least some of the Spokane agents were deposited in the PIA account. Because those facts are evidence of business activity, they are more reliable indicators of the parties' intent than are their conflicting explanations of a social gathering. The trial court was unpersuaded by defendant's attempt to characterize the monthly checks that he sent to plaintiff as payment for the purchase of his partnership interest in PIA, and so are we.

[3] Plaintiff argued at trial that overwrites on NFL policies are partnership assets. However, the trial court found in defendant's favor on that question, and plaintiff does not challenge that finding.

found that the dissolution of the partnership actually occurred in February, 1986, but, pursuant to an agreement of the parties, the judgment declared December 31, 1986, to be the effective date of dissolution.

The trial court then appointed an independent accountant as the referee to calculate the partnership assets and profits to be distributed. The referee's reports were expressly accepted by the parties. Because the actual original records were incomplete, the referee used computer-generated records purportedly prepared by defendant's wife from original documents. The court relied on the referee's reports in finding that PIA assets included $3,767.90 in cash and $14,975 in accounts receivable and that the only other assets—used office furniture and additions to defendant's computer system—had virtually no value. An equal division would result in an award of $9,371.45 to each partner. However, the court also found that plaintiff had overdrawn his capital account by $7,643.

■ Plaintiff argues that the trial court erred by adopting the referee's method of allocating expenses, particularly those itemized as "lead expenses,"[4] on a prorated basis between defendant's individual business and the partnership's business. He argues that, beginning in 1983, partnership income "was primarily, if not solely, attributable to policy renewals requiring no new sales and generating no business expenses, other than the minor expense involved in receiving and depositing checks in the partnership account."

Plaintiff asserts that none of the lead expenses should be subtracted from the partnership's gross income, because few, if any, new policies were sold by the partnership after 1983. He asks us to "exclude all business expenses run through the partnership account from 1983 through the date of dissolution in 1986." The trial court found that "the evidence regarding the so-called lead expenses is extremely uncertain." Plaintiff produced no evidence to show that the partnership did not purchase any leads, as it would have in the ordinary course of its business. Although the parties agreed that sales of Investors' policies had declined sharply by

---

[4] A "lead" is information about potential insurance customers. PIA and defendant purchased leads, which they in turn sold to their subagents.

June, 1983, the record contains no evidence about sales of policies for the other companies that the partnership represented. Moreover, the parties and the referee were unable to determine whether or how many leads resulted in sales. The partnership might have purchased any number of fruitless leads. What actually happened is not part of the record. Plaintiff did not prove by a preponderance of evidence that a *pro rata* allocation of expenses is inaccurate or that any other method would be more accurate. The referee's method is the only equitable approach supported by the record.

■    Plaintiff also assigns error to the trial court's failure to include the ongoing business value of PIA assets in making its distribution. He cites ORS 68.640 and *Timmermann v. Timmermann*, 272 Or 613, 627, 538 P2d 1254 (1975):

> "If the withdrawing partner allows the business to continue, the value of his interest in the partnership *as of the date of dissolution* is ascertained. He then has the right to receive, at his option after an accounting, either the value of his interest in the partnership with interest or, *in lieu of interest*, the profits attributable to the use of his right in the property of the dissolved partnership. ORS 68.640."[5] (Emphasis supplied; citations omitted.)

The value of plaintiff's interest in the partnership as of December 31, 1986, was less than zero: He owed defendant $7,643. Plaintiff seems to believe that he is nevertheless entitled to elect, in lieu of interest on less than zero, to receive 1/2 of the profits from renewals earned during the year after the dissolution. Assuming, without deciding, that a retiring partner could make that election in these circumstances, the evidence provides an insufficient basis for calculating the profits.

Plaintiff's expert witness testified that a person interested in purchasing a small insurance agency that had no reliable records of profits and expenses would "kind of, by

---

[5] ORS 68.640 provides, in relevant part:

"When any partner retires or dies, and the business is continued * * * without any settlement of accounts as between the estate of the partner and the person * * * continuing the business, unless otherwise agreed, the partner * * * may have the value of the interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of the interest * * * in the dissolved partnership *with interest, or,* * * * *in lieu of interest,* the profits attributable to the use of the right of the partner in the property of the dissolved partnership * * *." (Emphasis supplied.)

default" use the "multiple of revenue method" to calculate the entity's profitability. The record contains no evidence of any overwrites actually earned after December 31, 1986. Nevertheless, plaintiff asserts that the court should adopt the multiple of revenue method to approximate the profits that PIA assets earned after dissolution and add half of that value to his share. Application of that method would multiply the total overwrites for the previous year by a factor of 1 to 1.5. The expert explained that that "rule-of-thumb" method "makes the implicit assumption that a certain level of profitability will be there." According to him, items to consider in deciding which multiple to apply include, in addition to renewals, "[the agency's] on-going name, reputation and sales force in place that generates new sales * * *." To justify using a multiple of 1.5, he said:

"[Y]ou would have to have an extraordinarily profitable agency. * * * It would be a low level of cost relative to revenues, good growth, lots of young producers who were still building their book of business and a very high retention rate on the policies, very high renewal rate."

"[I]n an effort to expedite the final resolution of this case," plaintiff offers to concede a valuation based on a multiple of 1 times the previous year's revenues.

The expert stated that he had never evaluated an insurance agency that dealt only in medicare supplement insurance. Even if we accept plaintiff's view that the type of insurance sold should not affect the outcome, however, his expert did not provide an explanation that indicates how or why the multiple of revenue method should be applied to this particular insurance agency. Even if the multiple of 1.5 might be used to assess the profitability of a thriving insurance agency, such as the hypothetical one that the expert described, the expert did not furnish the appropriate multiple for an ongoing agency that was so spectacularly unproductive on the date of dissolution that it had no prospects for growth, no subagents selling policies and a renewal rate that had steadily declined for 3 years.

We agree with the trial court. The evidence of post-dissolution value is too speculative to justify adding *any* amount to the referee's valuation.

Affirmed.