Argued and submitted November 21, 1996, affirmed March 19, appellant's petition for reconsideration filed April 2 and respondent's memorandum in opposition filed April 15 allowed by opinion May 28, 1997
See 148 Or App 268, 940 P2d 242 (1997)

Mary E. BLANDAU,
Personal Representative of the
Estate of Richard L. Blandau, Deceased,
*Appellant,*

*v.*

Ronald L. RENNICK;
and DWT Oregon Corp.; Davis Wright Tremaine,
a General Partnership,
*Respondents.*

(94-CV-414; CA A90655)

935 P2d 457

Richard H. Berman argued the cause for appellant. With him on the briefs was Blackhurst, Hornecker, Hassen & Ervin B. Hogan.

Darleen Darnall argued the cause for respondents. With her on the brief were Robert D. Newell and Davis Wright Tremaine.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Plaintiff appeals from a judgment dismissing her claim for specific performance of a partnership dissolution agreement and, on defendant Rennick's counterclaim, ordering specific performance of a partnership agreement. She also appeals from the trial court's subsequent order awarding attorney fees to Rennick. We affirm.

In August 1988, defendant Ronald Rennick and plaintiff's decedent Richard Blandau, both medical doctors, entered into a partnership agreement to run a medical center.[1] The purpose of the partnership, known as Brookings Harbor Medical Center Partnership, was "to operate and maintain land and premises commonly known as Brookings Harbor Medical Center."

Rennick and Blandau had purchased the medical center a year earlier. They had obtained funds for the purchase through a loan from Chetco Federal Credit Union, on which Rennick and Blandau were jointly and personally liable. The loan amount totaled $618,000. As part of their efforts to obtain the loan from Chetco, both Blandau and Rennick procured life insurance policies on the other person's life and executed collateral assignments of those policies to Chetco. The total insured amount on each physician was $600,000. The assignments directed that, in the event of the insured's death, the insurance company should pay Chetco

> "to the extent of the moneys payable under said policy in an amount equal to the Assignor's indebtedness to the Assignee *upon receipt of a sworn statement of the amount of said indebtedness* to said Assignee, and the balance, if any, to the Owner or Beneficiary."

The loan agreement further provided:

> "*LIFE INSURANCE*: Lender requires and Borrowers agree that Borrowers will obtain and provide a life insurance policy on the life of Ronald L. Rennick, individually in the amount of $600,000.00, or an amount equal to the outstanding principal balance of the loan and a life insurance

---

[1] The partnership originally included a third partner, Loren Cohen, but he withdrew from the partnership before the period pertinent to this case.

policy on the life of Richard L. Blandau in the amount of $600,000.00, or an amount equal to the outstanding principal balance of the loan. *Said life insurance policies will name the Chetco Federal Credit Union as the beneficiary on said policies.* The Borrowers agree to maintain the life insurance policies as hereinbefore stated in full effect for the full term of this loan. In the event of the death of Richard L. Blandau or Ronald L. Rennick the proceeds from the aforesaid life insurance policy shall be used to pay the outstanding balance on this loan. Any balance remaining on the proceeds of the life insurance shall thereafter be paid to the survivors of Richard L. Blandau or Ronald L. Rennick, respectively." (Emphasis supplied.)

Chetco was never named the beneficiary on any of the policies. Instead, Rennick was the named beneficiary on the policies held on Blandau's life, and Blandau was the named beneficiary on the policies held on Rennick's life.

As a consequence of the 1987 loan agreement, the partners included in their 1988 partnership agreement the following provision:

"Life insurance on [Rennick and Blandau] in the amount of six hundred thousand dollars ($600,000.00) * * * shall be purchased by the respective person at their expense assigned to the holder of the mortgage obligation on the building located on the Brookings Harbor Medical Center. In the event of a partner's death, the designated insurance shall be used to pay off remaining indebtedness and to obtain clear title to the Medical Center."

The partnership agreement also provided, *inter alia*, provisions regarding how the partnership could be terminated and buy-out provisions in the case of a partner's death. Those provisions stated:

"2. Term. The Partnership shall commence on the date written above and shall continue until terminated by the written agreement by the partners, by operation of law, or by a decision of court of competent jurisdiction or an arbitrator.

"* * * * *

"19. Insurance. * * * [I]t is agreed that upon the death of a partner during the term of this agreement that:

"A.  The surviving partner * * * shall purchase the deceased['s] interest in the Medical Center from the estate for a price of two hundred and fifty thousand dollars ($250,000)[.]"

On October 12, 1994, Blandau and Rennick executed a document entitled "Agreement to Dissolve and Wind Up Partnership With Sale of Assets to One Partner." That agreement (the "dissolution agreement") stated, in part:

"B.  Rennick desires to sell his interest in the partnership and dissolve the partnership.

"C.  Blandau desires to purchase Rennick's interest in the partnership.

"IN CONSIDERATION OF the mutual covenants and conditions contained herein, the parties agree as follows:

"1.  Rennick shall retire from the partnership and shall sell, assign and transfer all of his interest in all of the assets of the partnership and in the business name of Brookings-Harbor Medical Center to Blandau on payment by Blandau of the purchase price of $178,000.

"2.  Blandau shall pay for the interest as follows: $1,000 on the execution of this Agreement to be deposited in escrow and $177,000.00 at the time of closing herein, to be specified below.

"3.  Rennick shall assign, transfer and convey his interest in the following property to Blandau as follows:

"* * * * *

"b.  All ownership interest in [two life insurance policies with combined face amounts totaling $600,000] issued by New York Life Insurance Company on the life of Dr. Richard Blandau.

"* * * * *

"14.  The partnership existing between the Partners under the name of Brookings-Harbor Medical Center Partnership *will be dissolved on closing* and this Agreement constitutes a full and complete accounting [of] the liquidation of the partnership business and, except as otherwise reserved herein, Rennick acknowledges that he has no claim or demand of whatsoever kind or nature against

Blandau, and Blandau acknowledges that he has no claim or demand of whatsoever kind or nature against Rennick.

"* * * * *

"17. *Conditions Precedent to Dissolution of Partnership and Closing.* The closing of the dissolution of the partnership and the terms of this agreement, as specified herein, shall be contingent and conditioned upon the following:

"a. The release of Ronald L. Rennick by the Chetco Federal Credit Union from all obligations under a loan, promissory note and trust deed to and from Chetco Federal Credit Union, Brookings, Oregon, dated March 31, 1987, securing the sum of $618,000.00." (Some emphasis supplied.)

On October 24, 1994, before Chetco had released Rennick from the loan obligation, Blandau died.[2] Rennick thereafter filed a claim as beneficiary of the life insurance policies held on Blandau's life, and the insurance company sent him the proceeds of those policies. At the time of Blandau's death, the outstanding balance on the Chetco loan was less than $600,000.[3] The insurance company did not receive a sworn statement of Chetco's claim to the proceeds before it sent the money to Rennick, and Rennick did not pay Chetco the outstanding balance from the life insurance proceeds or otherwise. After Blandau's death, Rennick's attorney sent the following letter to the title company that held the escrow account opened pursuant to the dissolution agreement:

"As you are aware, Dr. Blandau is now deceased. At the time of his death, there were two documents upon which the transaction was contingent that had not been fully executed, one which required Dr. Blandau's signature. Escrow should not have been opened before all of the documents had been fully executed. Since the transaction cannot now be closed, we hereby instruct you as follows:

"1. Cancel escrow.

---

[2] Before his death, Blandau had asked Chetco to release Rennick from the loan obligation.

[3] As of November 28, 1994, the outstanding balance on the loan was $454,345.

"2.   Return all documents deposited into escrow to our office.

"3.   Return the $1,000 earnest money[.]"

The title company did as requested.

Plaintiff, as personal representative of Blandau's estate, brought a claim for specific performance of the dissolution agreement. Her complaint alleges, in part:

"4.

"On or prior to the 12th day of October, 1994, [Blandau] and [Rennick] entered into an agreement to dissolve and wind up partnership and to sell the assets thereof to [Blandau.] [Rennick] agreed to sell and [Blandau] agreed to purchase, among other things, the undivided one-half interest of Rennick in the [medical center] * * * and the interest of [Rennick] in life insurance policies insuring the life of [Blandau.]

"* * * * *

"5.

"Immediately prior to his death, [Blandau] was ready, willing and able to perform all things required of him under the terms of said agreement.

"6.

"On or about November 3, 1994, [Rennick] by letter to the Curry County Title Company, the closing escrow agent in connection with the [dissolution agreement transaction], repudiated said agreement and demanded the return of all documents which had been deposited in said escrow. Thereafter, upon her appointment as personal representative of the estate of [Blandau], plaintiff tendered performance of all things required of [Blandau] under the terms of said agreement, which tender was rejected by [Rennick] and, in connection with which rejection, [Rennick] reaffirmed his repudiation of said agreement.

"7.

"The policies of insurance upon the life of [Blandau] were the subject of a collateral assignment in favor of [Chetco] to secure the payment of the loan to [Blandau] and

[Rennick.] The proceeds of the insurance upon the policies of insurance * * * are substantially in excess of the balance due to [Chetco] on account of the loan to [Blandau] and [Rennick.]

"8.

"Notwithstanding said agreement between [Blandau] and [Rennick] and the collateral assignment thereof to [Chetco] * * *, [Rennick] procured the payment to himself of the death indemnity benefits due under the terms of said policies of insurance * * *, and has appropriated to himself all of the rents, issues and profits of said real property.

"* * * * *

"10.

"Plaintiff is ready, willing and able to perform all things required of [Blandau] under the terms of the [dissolution agreement] and does herewith authorize and direct the payment from the proceeds of the insurance proceeds held by defendant DWT Oregon Corp. [4] of all sums due [Chetco] in order that any obligation of [Rennick] on account of the loan * * * shall be discharged."

Plaintiff prayed for, *inter alia*, specific performance of the dissolution agreement and an order directing Rennick's counsel, Davis Wright Tremaine, to hold the proceeds from the life insurance policies in trust for plaintiff and use the proceeds to pay the loan balance due to Chetco.

Defendants answered, and defendant Rennick asserted a variety of counterclaims, including counterclaims for specific performance of the terms of the partnership agreement and for attorney fees pursuant to the partnership agreement. Defendants thereafter moved for summary judgment on plaintiff's claim, arguing that the dissolution agreement was not specifically enforceable because a condition precedent to that agreement—*i.e.*, Rennick's release from the Chetco loan obligation[5]—had never occurred. Plaintiff countered that the nonperformance of that condition precedent

---

[4] At the time that plaintiff filed her complaint, defendant Davis Wright Tremaine, counsel for Rennick in this dispute, held the insurance proceeds in trust for Rennick. Defendant DWT Oregon Corp. is a corporation maintained by the law firm to act as agent for service of process for some of the law firm's clients.

[5] *See* dissolution agreement, ¶ 17a, quoted above. 147 Or App at 208.

had been excused "by defendant Rennick's wrongful interference with the parties' binding contract * * * promise concerning the collateral assignments to Chetco." In particular, plaintiff argued: "Dr. Rennick's own actions in repudiating the agreement and his intentional interference with the life insurance death benefits prevented the occurrence of the [condition] at issue."

The trial court granted defendants' motion, concluding:

"Dr. Rennick's position is that the dissolution agreement cannot be specifically enforced because a condition precedent has not been met and therefore the agreement is not enforceable. It is true that a condition precedent has not been met and the legal proposition that enforcement of the agreement cannot be obtained without a condition precedent being met is correct.

"Dr. Blandau's estate cites legal precedent that if the reason the condition precedent is not being met is due to an act of the person seeking to prevent enforcement of the agreement, then that does not prevent enforcement. That is also a correct legal position. Dr. Blandau argues that since it was the intention of [Chetco] to secure payment of the loan by the insurance policies in the event of the death of one of the borrowers, that Dr. Rennick by not paying over the funds has prevented the release. Obviously, full payment would release his liability.

"The doctors had a contract with [Chetco]. The life insurance provision was for the benefit of [Chetco]. [Chetco] accepted an assignment of the policies as collateral security rather then insisting that it be made a beneficiary. [Chetco] in essence waived that provision of the contract. Dr. Blandau's estate cannot now seek to enforce it. Both doctors submitted assignments rather [than] endorsements of a new beneficiary. Therefore, Dr. Rennick has not done anything that contravenes the terms of the contract to which [Chetco] * * * acquiesced. [Chetco] submitted no sworn statement to the insurance company. Dr. Rennick was the beneficiary of the insurance and submitted a claim as he was legally entitled to do with no agreement between he [sic] and Dr. Blandau requiring that those proceeds be paid to [Chetco]. Dr. Rennick has not caused the condition precedent to not be

met. Therefore, the dissolution agreement is not specifically enforceable."

Defendant Rennick thereafter moved for summary judgment on his counterclaims for specific performance of the partnership agreement and for attorney fees under that agreement.[6] Plaintiff opposed that motion, arguing that the court should reconsider its order regarding the dissolution agreement.[7] The trial court granted Rennick's motion and subsequently entered judgment dismissing plaintiff's claim, granting judgment on Rennick's counterclaims for specific performance and for attorney fees. Thereafter, the court entered an order awarding Rennick attorney fees, costs, and disbursements of $45,115.87.

Plaintiff raises four assignments of error. The first three pertain to the trial court's allowance of summary judgment against plaintiff's claim for enforcement of the dissolution agreement. The fourth assignment pertains to the amount of attorney fees that the trial court awarded to Rennick. We first consider, in the aggregate, those assignments of error pertaining to the allowance of summary judgment on plaintiff's claim.

Summary judgment is appropriate if there is no dispute regarding material facts, and the moving party is entitled to summary judgment as a matter of law. ORCP 47. In this case, the facts are not in dispute. The only issue is whether those facts, as a matter of law, compelled the court to grant defendants' summary judgment motion.

Plaintiff's first three assignments of error all pertain to different legal arguments as to why the dissolution agreement was specifically enforceable. Stripped to its essentials, plaintiff's argument is that the dissolution agreement's condition precedent, that Rennick be released from his loan obligation to Chetco, was unilaterally frustrated by Rennick when he refused to pay Chetco the remaining balance on the

---

[6] Rennick asserted five other counterclaims against plaintiff, all of which he voluntarily dismissed without prejudice.

[7] Plaintiff's sole argument in opposing summary judgment motion was that the dissolution agreement was enforceable and that, consequently, the partnership agreement was not. She did not make any other arguments regarding the terms or enforceability of the partnership agreement.

medical center loan from the proceeds of the insurance policies. Consequently, plaintiff contends, the condition precedent to performance of the dissolution agreement's terms was excused, and the parties' obligations under the contract became specifically enforceable. Defendants respond with various arguments as to why Rennick had no responsibility, enforceable by Blandau or his estate, to turn the insurance proceeds over to Chetco.

■ The resolution of this case turns not on the intentions of the partners as to the insurance proceeds but on the effect of Blandau's death on the existing partnership. As explained below, we conclude that Blandau's death effected a dissolution of the partnership, triggering the termination and winding up provisions of the *partnership* agreement. That, in turn, preempted and precluded a dissolution and buy-out by means of the *dissolution* agreement. The trial court, therefore, did not err in enforcing the partnership agreement and, consequently, in entering summary judgment against plaintiff's claim for specific performance of the dissolution agreement.

Pertinent to our analysis and disposition are the provisions of the Uniform Partnership Law (UPL),[8] ORS 68.010 *et seq.* Under the UPL, a partnership continues until its dissolution, which is defined as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." ORS 68.510. The time of dissolution is significant to a partnership, because, although it does not act to terminate the partnership, it " 'designates the point in time when the partners cease to carry on the business together.' " *Timmermann v. Timmermann*, 272 Or 613, 626, 538 P2d 1254 (1975) (quoting Official Comment, Uniform Partnership Act, 6 ULA 365, § 29 (1969)). Thus, dissolution triggers the end of the existing partner relationship and sets in motion the winding up and termination of the partnership.[9]

---

[8] Although denominated "Uniform Partnership Law," the act is a codification of the Uniform Partnership Act.

[9] The fact that a partnership agreement provides for the continuation of a partnership business after a partner's death or withdrawal from the partnership does not mean that a dissolution has not occurred. *Cf.* Alan R. Bromberg and Larry E. Ribstein, II *Bromberg and Ribstein on Partnership* § 7.05(a) (1994) ("[D]eath

Under ORS 68.530, a dissolution can occur:

"(1)  Without violation of the agreement between the partners:

"* * * * *

"(c)  By the express will of all the partners who have not assigned their interests or suffered them to be charged for their separate debts, either before or after the termination of any specified term or particular undertaking;

"* * * * *

"(4)  By the death of any partner[.]"

Here, the doctors' dissolution agreement evidenced "the express will of all the partners" to dissolve the partnership in a particular manner. ORS 68.530(1)(c). If the dissolution had occurred by virtue of the dissolution agreement, it would have concurrently wound up and terminated the partnership according to that agreement's buy-out provisions. *Id.* However, before the condition precedent to the dissolution agreement—Rennick's release from the Chetco loan obligation—could occur, Blandau died. Blandau's death dissolved the partnership, ORS 68.530(4), and, in turn, triggered the only winding-up and termination provisions that were then existing and enforceable—*i.e.*, the terms of the partnership agreement, specifically including the surviving partner's (Rennick's) entitlement/obligation to purchase the deceased partner's (Blandau's) interest for $250,000.[10] Thus, the superseding event of Blandau's death preempted and precluded dissolution, termination, and winding up pursuant to the still inchoate dissolution agreement.[11]

---

necessarily dissolves the partnership even if the partners' agreement provides for continuation of the business[.]"). Buy-out provisions simply represent the "winding up and termination" of a particular partner relationship.

[10] *See* "Term" and "Insurance" provisions quoted above. 147 Or App at 206-07.

[11] *Restatement (Second) of Contracts* § 765 (1981), provides:

"Where, after a contract is made, a party's principal purpose is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."

In this case, the principal purpose of both parties, *i.e.*, dissolution through the buy-out agreement, was made impracticable by the occurrence of a supervening dissolution-causing event, Blandau's death.

Plaintiff points out that the dissolution agreement contained a term binding the contracting parties' "heirs and assigns" to the agreement's terms. Invoking that provision, plaintiff argues that the parties had contemplated the effect that their deaths would have on the agreement and had agreed that the death of a partner would not change the enforceability of the agreement. Plaintiff's argument misses the mark. The agreement could be enforceable against the heirs and assigns only if, or when, the condition precedent to its formation occurred. Thus, the "heirs and assigns" provision pertained to performance that was required after the agreement became binding and, particularly, after the agreed dissolution occurred.[12] Again, Blandau's death, and the resulting dissolution by law, precluded that result. The trial court did not err in granting summary judgment on plaintiff's claim.

■   Plaintiff also assigns error to the trial court's award of attorney fees to Rennick in the amount of $45,115. She does not dispute that, if the partnership agreement controlled (*i.e.*, if the dissolution agreement was unenforced), Rennick was entitled to some fees. However, she contends that the amount granted was excessive:

> "This case was won on a three page memorandum in support of summary judgment. No depositions were taken. Seven attorneys at Davis Wright Tremaine posted time to this matter. The two primary attorneys charged over $200 per hour. The fees assessed by Defendant's counsel are exorbitant and unreasonable."

The amount of attorney fees granted to a party pursuant to a contractual provision "is left to the sound discretion of the court." *Miller v. Fernley*, 280 Or 333, 337, 570 P2d 1178 (1977). We have reviewed the evidence regarding the amount of attorney fees awarded, and conclude that, in the light of a variety of considerations, including the extensive motions practice involved in this case and the experience of

---

[12] For example, the agreement did not require Rennick to assign his interest in the insurance policies to Blandau until after the dissolution's "closing."

Rennick's attorneys, the trial court's award was within the reasonable range of discretion.

Affirmed.